[No. 22850. Department One. April 27, 1931.]

WILLIS NEARHOFF, *Respondent*, v. HOME INSURANCE COMPANY OF NEW YORK, *Appellant*, JOHN CORCORAN, JR., *Respondent*.[1]

*Cosgrove & Terhune* and *Walter B. Whitcomb*, for appellant.

*W. F. Fisher, Lloyd L. Black,* and *Thos. R. Waters,* for respondent.

MITCHELL, J.—This action was brought by Willis Nearhoff against the Home Insurance Company of

[1] Reported in 298 Pac. 427.

New York, a corporation, to recover on a policy of marine insurance on a ferry boat "City of Clinton," totally destroyed by fire on March 23, 1929. The policy provided "loss payable to W. Nearhoff, John Corcoran and Hiram Tuttle as their respective interests may appear." The policy appears to be of the standard form and has endorsed thereon, as a part of the contract, this language:

"Warranted confined to a regular established automobile run on Puget Sound between Lummi and Orcas Islands. Permission granted, however, for the vessel insured to make occasional trips to Seattle or other approved port on Puget Sound for repairs. Either party may cancel this insurance by giving the other party ten days notice in writing."

Corcoran and Tuttle were made parties defendant, upon the allegation that they claimed some interest in the subject matter. By an order of default, Tuttle passed out of the case. Corcoran appeared by answer, claiming an interest. The insurance company answered, admitting the making and delivery of the policy, but denied any liability thereunder and affirmatively alleged that the policy had been breached and was not in force at the time of the fire, because the vessel had not been kept within the confinement warranties endorsed upon the policy; and, further, it was claimed at the trial that, upon the proof admitted, it appeared that the policy had been breached by a sale or transfer of the vessel to a new management, during the currency of the policy and without the knowledge of the insurance company, contrary to a clause in the policy as follows:

"Should the vessel be sold or transferred to new management, then, unless the Underwriters agree in writing to such sale or transfer, this policy shall thereupon become cancelled from date of sale or transfer."

Upon the trial, a verdict was rendered in favor of Nearhoff and Corcoran against the insurance company. The insurance company has appealed from a judgment on the verdict.

The ferry boat was at all times owned by Nearhoff, until it was destroyed by fire. Under a conditional sale contract, he had delivered it to Corcoran and Tuttle, who were to and did operate it as an automobile and passenger ferry boat between Lummi and Orcas Islands until January, 1929, when, by mutual agreement in writing signed by all the parties, the conditional sale agreement was cancelled. It was understood at that time, however, by Nearhoff and Corcoran, that they, as partners, would operate the boat on the run between these islands, and a few days later they entered into a written agreement to that effect.

The ferry landing at Lummi Island was out of order and needed considerable repairs. The boat was in need of repairs also. Nearhoff, Corcoran, and Tuttle took the vessel to what is known as Deadwater Slough, within and a part of the port of Everett, for the purpose of making needed repairs. Their plan was to have her machinery and engine room overhauled and repaired, and then put her on the ways for the purpose of scraping and painting her hull. Several weeks were spent in making repairs, during which time Nearhoff ascertained that the ways at Everett were not long enough for the vessel. Arrangements were then made for the use of longer ways in Seattle. After delay somewhat greater than had been anticipated, on account of the amount of necessary repairs and the freezing of the water around the vessel, Corcoran, with competent help, took the vessel out of the Everett port on the way to Seattle for the additional repairs, and, after getting out into that portion of the Sound customarily traversed by that class of vessels running

from the vicinity of Lummi Island to Seattle, the vessel was accidentally burned.

■ ■ Appellant's first contention is that the taking of the vessel to Deadwater Slough in the Everett port constituted a breach of the policy, in that it was an unnecessary deviation or departure from the voyage provided in the policy. Counsel cite the case of *Canton Insurance Office, Ltd., v. Independent Transportation Co.*, 217 Fed. 213. That case is not in point, as we view it. There, the court found that the vessel had discontinued operations, contrary to the terms of the policy properly construed, had been taken from permitted waters, and four months afterwards, while moored within prohibited waters, with no watchman on board, filled and sank from some unknown cause. That was a case of an abandoned vessel. There is nothing of that kind in this case.

Rem. Comp. Stat., § 7183, is cited. It says:

"Deviation is a departure from the course of the voyage insured, . . . or an unreasonable delay in pursuing the voyage, or the commencement of an entirely different voyage."

Counsel also refer to some of the decided cases, one of which quotes Lord Mansfield as saying that the true objection to a deviation is "that the party has voluntarily submitted another voyage for that which has been insured." Those definitions, whether statutory or judicial, of the term "deviation" are plain, natural, and satisfactory, but we cannot see that they are helpful here. When this vessel went into the port of Everett for repairs, thence out further into the Sound on its way to Seattle for further necessary repairs, it was not engaged in a voyage, as that word is understood in connection with the terms deviation and departure. The question in this respect therefore is, not whether there was a deviation or departure, but

whether the insured were, in good faith and within the terms of the policy, engaged in making repairs to the vessel.

Of this there was, in our opinion, entirely enough evidence to satisfy the jury. That they were making needed repairs, that they were disappointed in finding the ways at Everett insufficient, that they had arranged to use ways at Seattle and were on their way to that port for that purpose, there was abundant evidence. The endorsement on the policy is "permission granted, however, for the vessel insured to make occasional trips to Seattle or other approved port on Puget Sound for repairs." Not to Seattle, but "to Seattle or other approved port."

That the Everett port was an approved one was testified by a number of disinterested persons engaged in shipping interests, including some who had a number of vessels which from time to time were put into this port, and into that particular portion commonly called Deadwater Slough, for repairs, frequently as many as fifteen or twenty at a time, and hardly ever less than one or two. There was no attempt to deny this proof, nor the further proof that the ways at Everett were too short for this vessel, and that arrangements had been made to use ways in Seattle.

Appellant's further contentions are also untenable, in our opinion. They are, (1) that the sale by Corcoran and Tuttle of their interests in the vessel, and (2) that the change in the management of the vessel from Corcoran and Tuttle to Corcoran and Nearhoff, all without the knowledge of the insurance company, breached the policy prior to the loss. As to the first, Corcoran and Tuttle did not sell any interest in the vessel, they simply failed to make payments on the contract and became parties to a written agreement voluntarily cancelling the conditional sale contract,

never changing title, possession, or the right of possession to anyone not at all times a party to the contract of insurance.

Nor was there any change in the management of the vessel so as to breach the policy. The insurance company knew when it wrote the policy that the vessel was held under a conditional sale contract with Nearhoff as vendor and Corcoran and Tuttle as vendees. The contract provided that, in case of loss, payment should be made to "W. Nearhoff, John Corcoran and Hiram Tuttle as their respective interests may appear." Nothing more than that is sought in this suit. Nearhoff was at all times the owner of the vessel until it was destroyed by fire. Corcoran at all times during the term of the policy was master of the vessel until it was destroyed, and had immediate charge of her at the time of the fire, at which time he was under contract as a partner with the owner for the future operation of the vessel. Tuttle had dropped out entirely, without bringing in or attempting to bring in any new party to the policy of insurance, or in any manner changing the risk.

An interesting collection of authorities upon this subject, generally, may be found in the case of *Mark v. Liverpool & London & Globe Ins. Co.*, 159 Minn. 315, 198 N. W. 1003, 38 A. L. R. 310, and in the note to that case. In that list is the case of *Lockwood v. Middlesex Mutual Assurance Co.*, 47 Conn. 553, which contains a discussion that we approve as applicable to the present case, as follows:

"The alienation here contemplated is a sale by the insured to a party not insured. Any transfer of interest between the parties insured by the policy is not an alienation within the meaning of the charter. By such a transfer no new party, with whom the defendants did not contract, is introduced, but simply the interest of those who did contract is changed. Such a

change does not affect the risk, whether partial or extending to the entire interest, so long as no new party is brought into contract relations with the insurers. If a party parts with his entire interest the insurance as to him ceases, and the purchaser, if a stranger to the policy, is not insured; if before a party to the policy the insurance enures to his benefit.''

Judgment affirmed.

TOLMAN, C. J., HOLCOMB, PARKER, and MAIN, JJ., concur.