BOSTON IRON & METAL COMPANY, INC. *v.*
AUTOMOBILE INSURANCE COMPANY.
[No. 51, January Term, 1929.]

*Decided April 3rd, 1929.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE and SLOAN, JJ.

*Francis Key Murray,* with whom were *Karr & Colgan* on the brief, for the appellant.

*Edgar T. Fell* and *Single & Single,* submitting on brief, for the appellee.

ADKINS, J., delivered the opinion of the Court.

This is a suit on a policy of marine insurance on a lighter known and designated as Lighter No. 176, purchased by appellant, plaintiff below, from the United States Navy Department at Charleston, S. C., in September, 1925. By the policy the appellee, defendant below, insured the lighter in the amount of $3,000 against loss from perils of the sea "attaching from October 31, 1925, 8 A. M., Eastern Standard Time * * * at and from Charleston, S. C., in tow of tug 'J. D. Wood' or 'Peerless' * * * to Baltimore." The lighter was lost at sea, whereupon plaintiff sued defendant for the amount of the policy. At the conclusion of plaintiff's testimony, the trial court directed the jury to find a verdict for the defendant, and on that verdict a judgment was entered for the defendant for costs. This appeal is from that judgment.

The single exception is to the granting of two prayers offered by defendant, on which the jury was instructed:

1. That there was no evidence legally sufficient to entitle plaintiff to recover.

2. That there was no evidence legally sufficient to establish plaintiff's claim that Lighter No. 176 was lost by the perils of the sea, that is, no evidence legally sufficient to establish the existence of a "peril of the sea" within the mean-

ing of such term as used in the law of maritime contracts, and therefore the verdict of the jury must be for the defendant.

In our opinion there was error in withdrawing the case from the jury.

Appellee contends:

1. That there can be no recovery if the lighter was unseaworthy either on October 31st, 1925, when the policy attached, or on December 10th, 1925, when the voyage was begun.

2. That the lighter was not lost by the perils of the sea.

3. That the delay in sailing from Charleston, from October 31st to December 10th, amounted to a deviation, and discharged the defendant.

Before considering these contentions we will review the testimony.

Mark H. Winner, who conducts a private marine surveying business, on December 7th, 1925, made an inspection of the lighter for the purpose of making such recommendations as were necessary to put the vessel in a seaworthy condition. When asked whether he found the vessel was seaworthy or not, and in condition to make the trip from Charleston to Baltimore in tow of a tug, he said that when he went aboard of the vessel he found that, due to a long lay up, there was an accumulation of water in the bilges, probably from rain, because the hatches were open; that there was a gasoline engine driven pump which went to pieces; that he recommended that steam be gotten in the boiler, that coal be placed aboard the vessel, and that sufficient pressure be carried in the boilers to operate the pumps; that the pumps were inspected, overhauled and made workable; and he had all of the openings in the deck fastened up, and the house braced, and the mast braced to keep it from working should the vessel encounter heavy weather; that the plaintiff was notified of this conclusion, and the recommendations made by him were carried out and adopted.

On cross-examination the witness said that, when he first saw the vessel, it was not in a fit condition to proceed to sea,

because there were certain things which were absolutely necessary to be done to put it in a seaworthy condition; but there was nothing brought out on cross-examination from which the court could find as a matter of law that the lighter was unseaworthy after his recommendations were carried out. Captain James E. Slover testified he was in charge of the lighter when she left Charleston around noon, December 10th, 1925; that there were three other men in the vessel, one engineer and two firemen; that the lighter was towed by the "Joseph Wood," a tug boat; that they were getting along very well and the vessel did not leak any, and was not leaking any in Charleston; that he was aboard seven or eight days before sailing; that some time in the afternoon of the following day "the wind began to blow pretty hard, and the boat got to rolling about and tumbling about, and she got to leaking, and she kept on gradually leaking, and the wind blew harder all the time, and getting rougher, until finally she leaked faster than the pumps would take the water out, and we had two good steam pumps going. And she kept on leaking, until finally we had to signal for the tug to come and get us, and I suppose a half hour or more elapsed from the time we signalled until the time the tug got back to us, and then she took us off, and that is all I know about it"; that they were then about thirty-five miles southwest of Cape Hatteras and it was about ten or eleven o'clock on the night of December 11th; that the tug could not come along the side of the vessel because it was too rough, but got within reaching distance and threw them heaving lines, which they tied around them and jumped overboard and were hauled in the tug; that he had followed the sea once in a while for forty or fifty years; never had charge of a deep-water ship, but had been to sea many times; that it was the roughest weather he had ever seen; that the wind was blowing one way and the sea quartering it; that "if it stayed that way all the time, nobody would go by Hatteras"; that he had been off Hatteras in winter before, but never saw the seas like that; that at the time the vessel began to leak there was a fairly moderate sea, but it

was a twisting sea, the wind blowing one way and the seas running another, the kind of sea that racks and twists a boat.

This witness' testimony was a good deal weakened on further cross-examination, and the foundation laid for a strong argument to the jury adverse to plaintiff's contention. Taking up now, in order, defendant's contentions:

1. In our opinion it is not the law that as a condition to recovery the vessel must have been seaworthy *for the voyage* at the time the policy attached. A different degree of seaworthiness was required for the voyage from that required while the vessel remained in port. *McLanahan et al. v. Universal Insurance Co.,* 1 Peters (U. S.), 170. In that case it was said: "Seaworthiness in a port * * * may be one thing, and seaworthiness for a whole voyage quite another. A policy on a ship at and from a port will attach although the ship be at the time undergoing extensive repairs in port, so as, in a general sense, for the purposes of the whole voyage, to be utterly unseaworthy." See also *The Caledonia,* 157 U. S. 125, 130. It is not contended that the lighter was not seaworthy on October 31st, 1925, for all purposes of the port.

Whether she was seaworthy for the voyage, when she sailed on December 10th, 1925, was a question of fact for the jury, if there was any evidence from which seaworthiness could be inferred. *Field v. Insurance Co. of North America,* 3 Md. 244, 250; *McLanahan et al. v. Universal Insurance Co., supra.*

In addition to the presumption of seaworthiness with which plaintiff starts (*Field v. Insurance Co. of North America, supra;* 14 R. C. L., p. 1046, sec. 223), there was enough in the testimony of Winner and Slover to send the case to the jury on this question. *Patrick v. Hallett & Bowne,* 1 Johns. (N. Y.), 241; 38 C. J., p. 1184, sec. 559.

2. The question whether the loss of the lighter was attributable to the perils of the sea was also one for the jury on the facts testified to. In *Field v. Insurance Co. of North America, supra,* it is said: "In the present case the prayer assumes that the damage was occasioned by a leak to be

ascribed to the defectiveness of the vessel, and to no other cause. The jury would probably have found the fact to be as assumed by the prayer, but the court erred in taking that question from their consideration. The presumption of law is, that the vessel was seaworthy. Whether the evidence removed that presumption was for the jury and not for the court." However, we do not understand this case to decide that it could in no case become a question of law for the court whether the presumption of seaworthiness was overcome, and the unseaworthiness established; for the court recognized the rule "that if the vessel spring a leak, or become disabled, or some essential defect is discovered soon after the risk commences, without any apparent cause from the perils within the policy, or rather when it satisfactorily appears that no accident can have happened to occasion the damage or defect, it is inferred she was defective at the beginning of the risk, and not seaworthy."

But it is undoubtedly authority for the proposition, that it is a question for the jury if there is any testimony from which it could be found that the loss resulted from a peril of the sea. We do not agree with the contention of defendant that a "peril of the sea" must be something catastrophic in its nature. In 38 *C. J.*, p. 1098, sec. 268, it is said: "The rule has been laid down that a policy insuring against 'perils of the sea' covers only extraordinary risks. But this, it has been held, does not mean that the peril must be extraordinary in the sense of arising from causes which are uncommon and could not be reasonably anticipated. It means rather that the peril must result from the violent action of the elements, as distinguished from their natural, silent influence upon the fabric of the vessel; casualties which may, and not consequences which must occur. In considering what is and what is not a peril of the sea, the question is whether the loss arose from injury from without or from weakness within," citing a number of federal cases. See also 14 *R. C. L.*, p. 1203, sec. 384. In *Western Assurance Co. v. Towing Co.*, 105 Md. 232, the upsetting of a lighter by the swell from a passing steamer was held to be a peril of the sea.

3. Appellee argues that *Augusta Ins. Co. v. Abbott,* 12 Md. 348, is conclusive in its favor on the question of deviation by delay. The facts of that case, so far as relevant to the present inquiry, were as follows: The policy was dated October 28th, 1852, and insured the shipper of a cargo of lumber at and from Baltimore to Boston. In reply to the insurance company's inquiry, before writing the policy, "Where is the Orb?" the agents of the skipper replied, "She is in Baltimore, about ready to sail (or she will sail soon)." The lumber was loaded on the brig "Orb" by the 19th of November, 1852, and she sailed on the 22nd of December following, was wrecked in Hampton Roads on the 3rd of January, 1853, and loss and damage resulted to the cargo. One of the defenses was that the policy had been discharged by the kind of delay in the inception of the voyage which amounted to deviation in construction of law. The court said: "We have no hesitation in saying that the delay which occurred in the sailing of the 'Orb' would amount to a deviation which would discharge the underwriters, unless it proceeded from causes which justify or excuse it * * *. What the actual causes of the delay were, is a question of fact for the jury. The legal sufficiency of such causes to justify or excuse it must be decided by the court. 7 *H. & J.* 291. * * * If the delay resulted from the difficulty of obtaining a crew, and there is evidence in the record to go to the jury tending to prove that fact, then the delay would be excusable, and the underwriters remain answerable." The court held certain prayers bad because, among other reasons, they failed to properly submit this question to the jury. It is not quite clear, but is fairly inferable, that the court meant to hold that in the absence of satisfactory explanation the *mere* delay shown *in that case* would have amounted to a deviation in law. If so, we have no disposition to extend that principle. In our opinion the present case is distinguishable from the case cited on its facts. There the court was dealing with merchandise loaded on a boat, the moving of which when loaded, in the nature of things, would be prompt, and the insurer might be presumed to have relied on a reasonably

prompt movement. Indeed the court's expression is apparently based on its preceding explanation of the rule when it says: "The reason why it is held to avoid the policy, is because it changes the risk, and substitutes a different voyage for the one insured against."

Here we are dealing with a vessel purchased by the insured from the government after it had been lying in the harbor unused for a considerable time, which was obviously out of repair and not in a condition to be moved promptly. There was apparently no reason to expect that it would be moved except at the convenience of the purchaser and the government. There is nothing in the policy to indicate that time was a matter of importance, and no evidence of any representations having been made as to the time of movement. Deviation must be shown by defendant. 38 *C. J.*, p. 1177, sec. 533, and cases cited.

It would therefore seem unreasonable to hold arbitrarily, as a matter of law, that the mere delay shown in this case amounted to a deviation. In our opinion, on the facts of this case, the burden was on the defendant to prove that the delay was unreasonable and unjustified, or other facts from which it could be found that the delay changed the risk and substituted a different voyage for the one insured against. 38 *C. J.*, p. 1188, sec. 572; *Earl v. Shaw*, 1 Johns. Cas. 313, 1 Am. Dec. 117; 14 *R. C. L.*, p. 1091, sec. 269; *Thebaud v. Great Western Ins. Co.* (1898), 155 N. Y. 516.

*Judgment reversed and new trial awarded, with costs to appellant.*